## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| POWER STEEL CO., LTD.<br>　　　Plaintiff,<br>　v.<br>UNITED STATES,<br>　　　Defendant,<br>　and<br>REBAR TRADE ACTION COALITION,<br>　　　Defendant-intervenor. | Court No. 20-03771<br><br>Public Version |

## **REPLY BRIEF OF POWER STEEL CO., LTD.**

Adams C. Lee
HARRIS BRICKEN SLIWOSKI LLP
600 Stewart Street
Suite 1200
Seattle, WA 98101
(206) 224-5657

July 16, 2021

**TABLE OF CONTENTS**

**I.   DOC'S TREATMENT OF SECTION 232 "NATIONAL SECURITY" TARIFFS AS "ORDINARY" CUSTOMS DUTIES WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS NOT IN ACCORDANCE WITH LAW .................................................... 1**

**II.  THE DEPARTMENT'S DETERMINATION THAT PSCO PAID SECTION 232 DUTIES ON ALL U.S. SALES WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ......................... 8**

**III. CONCLUSION ................................................................................................................. 13**

Plaintiff Power Steel Co. Ltd. ("Plaintiff" or "PSCO") submits this reply brief to address certain arguments submitted by Defendant, the United States, and Defendant-Intervenor, the Rebar Trade Action Coalition ("RTAC") in their respective response briefs to defend the determinations of U.S. Department of Commerce's ("Department" or "DOC") in the final results of the first administrative review of the antidumping duty order on steel concrete reinforcing bar ("Rebar") from Taiwan.  *Steel Concrete Reinforcing Bar From Taiwan: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 63,505 (October 8, 2020) (Public Record ("PR") 132) and accompanying Issues and Decision Memorandum (PR 128) ("*I&D Memo*") (collectively, "*Final Results*").

I. **DOC's Treatment of Section 232 "National Security" Tariffs as "Ordinary" Customs Duties Was Not Supported By Substantial Evidence and Was Not In Accordance with Law**

The Department and RTAC both attempt to defend the Department's decision to treat Section 232 as equivalent to "normal" U.S. customs duties that could be deducted from the export price of PSCO's U.S. sales transactions in the calculation of PSCO's dumping margin. The arguments in their response briefs, however, mirror the same reasons stated in the *Final Results* and add little clarification or justification for their conclusion that Section 232 "national security" duties should be treated as equivalent to ordinary customs duties.  As discussed in PSCO's brief and this reply brief, the Department should have determined that Section 232 duties are "special duties" that are more like antidumping duties and Section 301 safeguard duties, and less like "ordinary" customs duties that are deductible U.S. expenses for dumping margin calculation purposes.

Fundamentally, the Department and RTAC cannot address the logical fallacy that, on the one hand, the Department and the President made the rare and exceptional determination under

Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862) that all steel imports shall be deemed a "national security" threat, but on the other hand, the imposition of Section 232 tariffs nonetheless should be treated the same as ordinary customs duties.  There is an inherent contradiction that the national security threat provisions of Section 232 have so rarely been invoked and yet the Department argues Section 232 duties should be treated as being equivalent to ordinary customs duties that apply to all imports.  One would hope that national security threats from imports is not common, but the Department's argument that Section 232 duties should be treated as normal customs duties suggests that the Department believes the tariffs assigned by the designation of certain imports as national security threats should be treated no different than the normal duties calculated from the assigned duty rates for each tariff code in the U.S. Harmonized Tariff Schedule.  The rare and exceptional nature of Section 232 duties cannot be overridden by a Presidential declaration that these national security duties should be treated as equivalent as normal duties.  The fact that the President had to take the exceptional action of issuing an executive order to declare Section 232 duties to be treated as ordinary duties highlights the absurdity of treating Section 232 duties as equivalent to ordinary customs duties.

       The Department makes the contorted argument that the "effect" of Section 232 duties "to assist a weakened domestic industry" is different from the "purpose" of protecting national security interests.  Department's Response Brief at 14.  This is a distinction without a difference.  Protecting the viability of the domestic steel industry by imposing a tariff on all steel imports is the same as protecting the domestic steel industry by imposing antidumping, countervailing, or safeguard duties on steel imports.  Placing a label of "national security" on the Section 232 tariffs does not mean that they are substantively any different from the fundamental purpose of AD/CVD or safeguard duties of protecting the domestic steel industry from import competition.

Antidumping duties and Section 201 safeguard measures are both "directed at the same overarching purpose – protecting the bottom line of domestic producers." *See Wheatland Tube*, 495 F.3d at 1362.  But protecting the bottom line of domestic producers also serves the same goal of protecting the economic viability of those domestic producers, which was among the reasons for imposing the Section 232 national security tariffs.

It is particularly problematic that "national security" is not defined by Section 232.  The statute provides that an investigation must consider certain factors, such as domestic production needed for projected national defense requirements; domestic capacity, the availability of human resources and supplies essential to the national defense; and potential unemployment, loss of skills or investment, or decline in government revenues resulting from displacement of any domestic products by excessive imports.  19 U.S.S. § 1862(d).  But the statute does not require any finding of facts to support any national security threat determination.  Any imports could be designated a national security concern if the President deems so, regardless of how little factual evidence may support that determination.  The President's decree that imports pose a "national security" threat is not justiciable because there is no definition of what constitutes a "national security" interest and there is no opportunity for the courts to review whether a "national security" threat determination has a sufficient evidentiary basis or was arbitrarily made by executive fiat.

Both the Department and RTAC narrowly construe the decision of the Court of Appeals for the Federal Circuit ("CAFC") in *Wheatland Tube* that found that Section 201 safeguard duties were special duties more akin to antidumping duties than "ordinary customs duties." *See, Wheatland Tube Co. v. United States*, 495 F. 3d 1535, 1363 (Fed. Cir. 2007)).  The Department and RTAC raise arguments that focus on how Section 232 duties do not specifically express the

3

same purpose to remedy a domestic industry's material or serious injury, unlike antidumping or safeguard duties.

Special duties, however, are not limited to only remedial duties. Section 232 duties certainly are not like ordinary customs duties because the unique purpose of protecting a national security interest makes the Section 232 tariffs special and unique. As noted in PSCO's initial brief, the Section 232 duties are remedial in nature because they were intended to be part of the *remedial actions* necessary to protect U.S. national security interests. The Federal Register notice issued by the Department's Bureau of Industry and Security (BIS) specifically stated that the Section 232 duties are "remedies" issued by Presidential Proclamation. See, *Requirements for Submissions Requesting Exclusions from the Remedies Instituted in Presidential Proclamations Adjusting Imports of Aluminum Into the United States and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12106 (March 19, 2018) (emphasis added). Throughout this notice, the BIS consistently refers to "Procedures for Submitting Requests for Exclusions from the *Remedies* Instituted by the President" in the relevant Presidential Proclamations. Footnote 4 of this notice states:

> As explained in the reports submitted by the Secretary to the President, steel and aluminum are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States and therefore the President is implementing *these remedial actions* (as described Proclamations 9704 and 9705 of March 8, 2018) *to protect U.S. national security interests*.

The Department highlights how Section 232 duties differ from antidumping and safeguard duties because Section 232 duties can be imposed even if a domestic industry is not suffering. Department's Response Brief at 15. But the fact that Section 232 duties can be imposed even if the domestic industry is not suffering any type of injury or that the imports were

not unfairly traded highlights the special nature of the Section 232 duties.  Antidumping duties require a finding that imports were dumped (sold at less than normal value) and caused or threatened to cause material injury.  Section 201 safeguard duties can be imposed even on fairly traded imports as long as there is a finding that imports have caused serious injury, which is a higher injury standard than material injury for antidumping duties.  Section 232 duties, however, can be imposed on imports that are neither unfairly traded nor causing any type of injury.  Because Section 232 do not require any finding of unfair trading or any type of injury, this highlights the "special" nature of these "national security" duties that are even beyond the requirements for antidumping or safeguard duties.

 Moreover, the Section 232 national security provisions are consistent with Article XXI of the General Agreement on Tariffs and Trade (GATT) and the World Trade Organization agreements, which allows member countries to take measures to protect "essential security interest" that otherwise might be contrary to other international trade commitments and obligations.  The national security provisions under Section 232 are a special exception to the normal trade rules that would otherwise apply.  Actions taken under the national security provisions of Section 232, including the imposition of tariffs, are special actions that may be permitted even though the imports affected may be fairly traded and not causing any injury.  But the invocation of national security interests is clearly intended to be a special exception to justify the departure from the normal trade rules that otherwise may have prohibited such action.  There is no legal basis for the President to assert that Section 232 duties should be treated as "ordinary"

customs duties when the statutory basis for Section 232 was intended to provide a special exception to the normal trade rules.

In contrast, normal customs duties are the "ordinary" duties or taxes imposed on imports. "Ordinary' customs duties reflected in the U.S. Harmonized Tariff Schedule (HTS) identify the applicable duty rates (usually an ad valorem rate) for imported products. In contrast to the ordinary customs duties, the HTS highlights the special nature of the Section 232 duties by identifying them under Chapter 99 of the HTS which specifically includes the word "temporary" to highlight that the coverage of this chapter is different from the products specified in all other chapters in that these measures are only temporary. HTS Chapter 99 "*Temporary* Legislation; *Temporary* Modifications Established Pursuant to Trade Legislation; Additional Import Restrictions Established Pursuant to Section 22 of the Agricultural Adjustment Act, as Amended." (emphasis added). *See also, Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. at 19159-60 (April 12, 2004). (Department rejected the petitioner's request to treat Section 201 duties as normal duties because they were recorded in the HTS just like normal customs duties, and specifically cited to the fact that Chapter 99 of the HTS was for "special or temporary duties" unlike the other chapters of the HTS).

The Department tries to distinguish Section 232 duties which have no termination provision, in contrast to antidumping and safeguard duties having statutory expiration deadlines tied to the cessation of injury. Department's Response Brief at 17. Although Section 232 duties do not have a specific statutory provision that limits the duration of any action taken by the Executive Branch, there is no statutory provision that sets forth that any action (tariff, embargo, voluntary restraint agreement) taken under Section 232 should be deemed as being more like normal customs duties which are considered permanent unless specifically modified by

6

Congress. *Wheatland Tube*, 495 F.3d at 1362. Section 232 duties can be lifted by Executive Order just as quickly as they were imposed by Executive Order. This highlights how the Section 232 duties are unlike the more permanent normal customs duties that require Congressional action for revision, even if they lack a specific statutory termination provision like antidumping and safeguard duties.

Ultimately, the defense of the Department's determination that Section 232 national security tariffs should be treated as ordinary customs duties is based upon "because the President said so." Just as an executive order declaring "black" to be "white" does not make that change true, so does the President's statements that Section 232 duties should be treated as ordinary duties also does not change the true nature of the Section 232 duties. If anything, the Department's inability to cite any explanation other than the President's say-so highlights how the nature of Section 232 duties is special and not like ordinary customs duties that apply to any and all products covered by the HTS. The remedial purpose of Section 232 duties is layered within a broader national security concern, but the remedial purpose of Section 232 duties still more closely resembles the remedial purpose of antidumping and safeguard duties than normal duties which have ordinary tax and revenue generating purpose. The authority to impose Section 232 national security duties even in the absence of any level of injury suffered by the domestic industry, highlights how special and unique the Section 232 duties are, and are in stark contrast to ordinary customs duties.

## II. The Department's Determination that PSCO Paid Section 232 Duties On All U.S. Sales Was Not Supported By Substantial Evidence

Even if the Court agrees with the Department that Section 232 duties should be treated as U.S. duties for purposes of antidumping margin calculations, the Court must then decide whether the Department's determination that PSCO paid Section 232 duties on all of its U.S. sales was supported by substantial evidence.

Both the Department and RTAC argue primarily that PSCO did not sufficiently prove that it did not pay the Section 232 duties for [    ] U.S. sales transactions during the period of review.  However, neither the Department nor RTAC can cite to any record evidence that demonstrates PSCO did in fact actually paid the Section 232 duties for the [    ] U.S. sales transactions in dispute.

The Department and RTAC in their briefs focus on arguing that PSCO did not carry its burden of proving that PSCO did not pay the Section 232 duties for the [    ] PSCO U.S. sales in question.  The Department and RTAC argue that the Department acted reasonably in dismissing the evidence submitted in PSCO's 4SQR to demonstrate that PSCO did not make the payment of the Section 232 duties, but rather that PSCO's customer (or the customer of PSCO's customer) made these payments.   As noted in PSCO's initial brief and below, the Department's consideration of PSCO's submitted information was inadequate and unfairly refused to give any probative value.

The Department and RTAC offer little additional analysis other than their summary dismissal of PSCO's submitted sales contract revisions and email correspondence as invalid or incomplete.  With regard to the contract revisions, PSCO submitted a copy of its sales contract that included a term that included a handwritten note that indicated that either the customer

8

[          ] or consignee [        ] would be responsible for paying the AD duty and the section 232 25% tariff for the products covered by this agreement, not Power Steel.  However, the Department summarily dismissed this contract revision merely because it was handwritten or not countersigned.  Yet the Department and RTAC do not dispute PSCO's argument that fundamental common law contract principles give parties the freedom to enter into a binding contract or modify an existing contract in any form or manner.  A legal formation or modification of a contract does not need to be in writing or formally counter-signed, but can be formed or modified by a handshake or oral statement or by the parties' actions.   Even in the absence of a formal, typed-out, or countersigned note, the hand-written revisions that scratched out PSCO and added [                  ] was still a legally valid amendment to this contract term that indicated the parties' intent that PSCO would no longer be responsible for making payment of the AD and Section 232 duties for this transaction, but rather the customer or consignee ([                ]) would make the payment of the AD and Section 232 duties.  At a minimum, the Department should have considered whether the handwritten revisions were supported by any other evidence of supporting documentation or action by the parties involved in the transaction.

The Department similarly unreasonably dismissed the email correspondence submitted by PSCO to corroborate that the hand-written revision to the agreement did in fact reflect the intention of the parties so that PSCO would no longer be responsible for payment of the AD or Section 232 duties for this transaction, but rather the customer or consignee would by the party paying those duties.  The Department mischaracterizes PSCO's email correspondence as "fragmented communications " only between PSCO, its U.S. customer and its broker, and faults PSCO for not having any email communications with the ultimate consignee.  *DOC Final PSCO Calculation Memo* at 8 (citing PSCO 4SQR at Exhibit 4) (CR 98, PR 131). The Department does

not dispute any of PSCO's explanations why the ultimate consignee was not included in the email correspondence, primarily because PSCO's agreement was with its customer, and that any communications with the consignee came through the customer, and not directly to PSCO. PSCO's Brief at 27-29. Similarly, the Department cannot continue to argue that the emails did not identify what wire payment was sent, by whom, and for what purpose, when PSCO in its brief explained how the emails clearly show that [      ] sent the wire payment to [          ] to pay the duty amounts for the [     ] PSCO entry transactions. PSCO's Brief at 29-30.

The parties intent for a particular contract should be discerned from the totality of the circumstances. *See*, *e.g. R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) ("What matters are the parties' expressed intentions, the[ ] words and deeds which constitute objective signs in a given set of circumstances."). Here, the Department's unreasonably flawed analysis of the revised sales contract and email correspondence submitted by PSCO cannot constitute substantial evidence for its determination that PSCO had failed to demonstrate that some other entity made the payments for the Section 232 duties in question.

The Department also faulted PSCO for not submitting bank or payment documentation to prove the non-payment of the [    ] entries in question. However, the Department did not ask for bank or payment to document to prove that PSCO did in fact make the payment of the [   ] other entries that PSCO acknowledged it had paid. Rather the Department accepted that the documentation (reconciliation worksheet, 7501 entry summaries, accounting entries, but no proof of payment of duties) submitted by PSCO was sufficient to prove PSCO's payment of the Section 232 duties for the [    ] entries *not* in question. If this documentation was accepted by the Department to prove the payment of Section 232 duties for [    ] of PSCO's duties, the absence of similar documentation should have been at least a relevant indication of the non-

payment by PSCO of the Section 232 duties for the [ ] entries in question. PSCO's failure to submit bank or payment documentation for the [ ] entries was not a problem for the Department to accept that PSCO paid the Section 232 duties for these entries. It would be inconsistent and unreasonable for the Department to consider the failure of PSCO to submit bank or payment documentation as dispositive for the [ ] entries in question, when the Department had no problem with the absence of such documentation for the [ ] other entries that were not in question.

The Department does not dispute that PSCO's accounting records were not maintained in the normal course of business or otherwise unreliable. The record evidence of PSCO's accounting records showed PSCO made payments of Section 232 duties for only [

] U.S. sales transactions during the POR as recorded in its account [             ]. PSCO was able to fully reconcile the Section 232 duties between what was reported in its U.S. sales database, to the underlying source documents (7501s), to PSCO's accounting records (G/L – account [              ], trial balance), and to PSCO's audited financial statement ("other gains and losses, net"). See PSCO's 4SQR at 1-3, Exhibit 1 and 2.

If PSCO had tried to claim that it had paid Section 232 duties for all [ ] of its U.S. sales transactions, this record evidence would not support such a claim because PSCO's accounting records show only that PSCO made payment for Section 232 duties for only [ ] of PSCO's U.S. sales transactions. Likewise, the Department cannot make the assertion that PSCO paid Section 232 duties on all of its U.S. sales transaction, when this record evidence of PSCO's accounting records where it normally records payment of Section 232 duties shows payment only for [            ] U.S. sales transactions. Without explaining this contradictory

11

record information, the Department's determination that PSCO paid Section 232 duty expenses for all U.S. sales cannot properly found to be based on substantial evidence.

The Department certainly accepts the evidence of PSCO's accounting records as reliable evidence that PSCO made payment for [    ] of the U.S. transactions.  But this evidence of PSCO's accounting of its Section 232 duty payments should also be relevant to show that PSCO did not pay Section 232 duties for the [    ] entries in question.  PSCO's accounting records show that someone other than PSCO had to have made those Section 232 duty payments for the [    ] entries in question. Although the Department may disagree with PSCO that the record evidence shows that some other party ([    ]) paid the Section 232 duties for these [    ] transactions, the Department cannot point to any record evidence that shows that PSCO actually paid the Section 232 duties for these transactions.

The Department in its *Preliminary Results* acknowledged that its decision to deduct Section 232 duties from PSCO's U.S. sales relied solely upon PSCO's categorical statement that it was importer of record responsible for payment of all duties due at the time of entry, but that by itself PSCO's categorical statement was not enough to constitute substantial evidence.  The information submitted in PSCO's 4SQR that detracts from the Department's determination has not been adequately considered by the Department.  With respect to the [    ] U.S. sales in question, the Department's determination in the *Final Results* is no different than its determination in the *Preliminary Results* in that it relies solely on PSCO's categorical statement that it was importer of record and thus responsible for payment of all duties (antidumping, Section 232, normal) owed to CBP at the time of entry.  The Department's determination that PSCO paid the Section 232 duties, even for the [    ] U.S. sales in question, cannot be supported by substantial evidence because the Department fails to address the evidence of

PSCO's reconciliation worksheet and supporting documentation from its accounting records that show it made payment of Section 232 duties only for [                    ] U.S. sales transactions during the POR.

### III. CONCLUSION

For the reasons discussed above, PSCO respectfully requests that the Court hold that Department's decision in the *Final Results* that Section 232 duties should be treated not as special duties like antidumping or safeguard duties, but rather as normal U.S. customs duties and deducted from U.S. price in PSCO's dumping margin calculation was not supported by substantial evidence and was not in accordance with law. Even if the Court finds that Section 232 duties should be treated as ordinary U.S. customs duties, PSCO requests that the Court find that the Department's decision that PSCO made payment of the Section 232 duties for certain entries was not supported by substantial evidence. PSCO requests that the Court remand this matter to DOC with instructions to not deduct the Section 232 duties from PSCO's U.S. export price for either all of PSCO's U.S. sales during the period of review or for the specific sales in question.

Respectfully submitted,

\_\_\_/s/ Adams C. Lee\_\_\_
Adams C. Lee
HARRIS BRICKEN SLIWOSKI LLP
600 Stewart Street, Suite 1200
Seattle, WA 98101
(206) 264-5457
Counsel to Power Steel Co., Ltd.

13

**Certificate of Compliance with Chambers Procedure 2(B)(1)**

The undersigned hereby certifies that the foregoing reply brief contains 3,967 words, exclusive of the table of contents, table of authorities, and certificates of counsel, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

BY: */s/Adams C. Lee*
Adams C. Lee